## SPARTAN AIRCRAFT CO. v. UNITED STATES.

### No. 48689.

United States Court of Claims.

Oct. 2, 1951.

172

C. Lansing Hays, Jr., New York City, for plaintiff. David S. Hecht and Leve, Hecht, Hadfield & McAlpin, New York City, were on the briefs.

John R. Franklin, Washington, D. C., with whom was Acting Asst. Atty. Gen. Newell A. Clapp, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

LITTLETON, Judge.

On November 29, 1946, plaintiff and defendant entered into contract No. Ilr–1489. In consideration of prescribed unit prices plaintiff agreed to furnish the labor and materials for the inspection, repair, modification, and conversion of two twin-engine Beechcraft airplanes, referred to in our findings and in this opinion as NC 1064 and NC 1065, owned by the Bureau of Reclamation.

On December 24, 1946, the parties entered into another contract, No. Ilr–1491, under which plaintiff agreed to resound-proof and reupholster the two planes for a total consideration of $2,217.04.

Plaintiff has been paid for neither contract and sues here for the contract price for each. There is no issue with respect to contract No. Ilr–1491, the resoundproofing and reupholstering contract; defendant admits that plaintiff has fully performed this contract. However, defendant denies performance of contract No. Ilr–1489. Defendant has interposed a counterclaim alleging that as a result of plaintiff's material breach of its contractual obligations under contract No. Ilr–1489 and its failure to use due care and perform in a workmanlike manner, plane NC 1064 was forced to make an emergency landing and was damaged as a result. The counterclaim asks judgment for the amount of the damage.

By March 23, 1947, plaintiff had finished working on NC 1064 and it was redelivered to defendant. Between that date and April 21, 1947, the plane was flown by defendant on thirteen separate days. On April 21, 1947, while en route from Santa Fe to Albuquerque, New Mexico, the engines failed and the plane was forced to make an emergency landing. The details are set out in our findings. The engines' failure was caused by a stoppage of fuel resulting from a parting during flight of a fuel line fitting just aft of the firewall in the plane's right wheel well. We have described this L-shaped fitting and the B-nut which engaged it in our findings. The line broke when the B-nut worked loose from the L-shaped fitting.

Defendant contends that plaintiff failed properly to inspect this fitting before the plane left its plant. Item 3 of the contract required plaintiff to perform a 100-hour inspection in accordance with an attached check list and to correct all unsatisfactory conditions found. In the section of the check list entitled "Fuel and Oil Systems" was the following: "Fuel Lines: With fuel 'On' and pressure built up, inspect fuel lines and connections for leaks, cracks, security of anchorage, chafing, tight-

ness and condition of hose connections and hose clamps."

It is our finding that plaintiff followed customary procedure ·in performing the "Fuel and Oil Systems" section of the 100-hour inspection.

Defendant has sought to prove that the B-nut was only partially engaged, to the extent of only 3 to 3½ threads, when plane NC 1064 left plaintiff's plant, or, alternatively, that the B-nut was fully engaged but handtight only. A B-nut is not suitable for operation unless it is wrenchtight. However, it is possible for even a wrenchtight B-nut to vibrate loose from its connection.

We find the evidence insufficient to establish that the B-nut was only partially engaged when the plane left plaintiff's plant. The wobble pump test and the other tests made of the fuel system, by plaintiff and later by defendant's pilot and mechanic, negative this possibility. On the other hand, the evidence is not sufficient to enable us to find as a fact that the B-nut was wrenchtight when the plane left plaintiff's plant. However, a conclusion that it was wrenchtight at that time is at least as reasonable as a conclusion that it was only handtight. It is not the practice during a 100-hour inspection to use a wrench on every B-nut in the fuel system. Plaintiff's employees did not use a wrench to tighten this fitting. There is no evidence that they disconnected or loosened it. However, plaintiff's inspector felt the nut with his hand, tried to loosen it, and found that he was unable to turn it.

If the B-nut was only partially engaged, or fully engaged but handtight only, it was up to defendant to prove it. The suit, after all, is on the contract. Plaintiff has shown completion of the work, redelivery of the plane to defendant, acceptance of it by defendant, and use of it thereafter by defendant. This is more than enough to make out a prima facie case of performance. The burden of establishing a breach and the burden of proving that the breach caused the damage to which the counterclaim is addressed were on the Government. Under the circumstances we must hold for plaintiff. See Lucas National

Bank v. United States, 18 Ct.Cl. 349; Morrison v. Le Tourneau Co. of Georgia, 5 Cir., 138 F.2d 339. The counterclaim is directed in terms solely to the damage to plane NC 1064; it must be dismissed.

With respect to the other plane, NC 1065, however, defendant has proved four items of faulty performance. On one side of the torque shaft of the landing gear mechanism one bolt was missing and another was loose. A pump in the anti-icer system was clogged. Plaintiff failed to replace cracked and weathered hose in the oil lines in both wheel wells. The installation of one of the rudder trim tab control cables was faulty. Each of these defects was a violation of Item 3 of the contract which required plaintiff to perform a 100-hour inspection and correct all unsatisfactory conditions found.

While plaintiff denied that these defects existed, it argued that if they were found to have existed, defendant's allowance therefor should be merely the cost of remedying them. Neither party sought to prove by evidence the cost of remedying any or all of these defects on plane NC 1065. In its exceptions to the Commissioner's report and in the brief plaintiff contended that the cost would not exceed $100.

Defendant raises the question of whether, the contract being considered indivisible both as to the two planes and as to the fourteen separate items for each plane, the result of the four defects on NC 1065 should not be that plaintiff recovers nothing on contract No. IIt–1489. We note, however, that defendant concludes its brief with the assertion that it is entitled to judgment in the sum of $24,102 (the alleged cost of repairing the damage to NC 1064) plus $6,194.58 (that part of the contract price allocable to performance of Item 3 on NC 1065), against which defendant would allow plaintiff the contract prices of the two contracts, or $24,430.30 plus $2,217.04.

The severability, or divisibility, of a contract is a vexing problem. See, for example, the annotations at 147 A.L.R. 933; 71 A.L.R. 479; 2 A.L.R. 686; and 2 A.L.R. 643. See also Williston on Contracts (Rev. Ed., 1936) §§ 860A–863. The authorities

hold that the question is essentially one of the intention of the parties; examination of some of the many cases on the point suggests rather that resolution of the question has more commonly been a matter of the intention of the court.

Contract No. Ilr–1489 obligated plaintiff to—"perform all work and furnish parts required to place the airplanes in as nearly perfect operating condition as is possible."

The printed bid form, part of the contract, contained the following (the numerals were typed in): "In compliance with the above invitation for bids, and subject to all the conditions thereof, the undersigned offers, and agrees, if this bid be accepted within 30 calendar days from the date of the opening, to furnish any or all of the items upon which prices are quoted, at the price set opposite each item, delivered at the point(s) as specified and, unless otherwise specified, within 90–100 calendar days after receipt of order."

The total contract price was not stipulated. Fourteen separate items of performance were set forth in the contract. For three of these a per hour labor rate was fixed. For ten others the net cost was specified. The fourteenth item, flight testing, was to be free. This pricing arrangement, and also the provision in the bid form above quoted, suggest the possibility of apportioning the compensation to each item for each plane. Indeed, we have found that at the rates specified in the contract the total price for the inspection, repair, and modification of plane NC 1064 was $12,169.-75, and for NC 1065, $12,260.55; we have also found that for NC 1065 the total contract price allocable to Item 3 was $6,194.-58, including labor in the amount of $4,975.-96 and material in the sum of $1,218.62. The apportionability of the compensation is some indication that the contract may be divisible as to the two planes and as to the separate items for each plane. See Traiman v. Rappaport, 3 Cir., 41 F.2d 336, 338, 71 A.L.R. 475.

On the other hand, Item 3, calling for the 100-hour check, was probably the most important part of the contract. We feel reasonably certain that defendant would not have entered into the agreement if Item 3 were not a part of it. This, of course, is some indication that the contract was not severable but was a single, entire obligation. See United States v. Bethlehem Steel Corporation, 315 U.S. 289, 298, 62 S.Ct. 581, 86 L.Ed. 855. It has been said, however, that while this indicates that there was but one contract, it does not prevent such contract being regarded as severable or divisible. See Douglas, J., dissenting in the Bethlehem case, 315 U.S. 338, 62 S.Ct. 581, 86 L.Ed. 855.

If we regard the contract as divisible, it is not divisible beyond the fourteen separate items of performance. Item 3, the 100-hour check provision, was certainly an entire obligation. Whatever other benefits defendant received from the contract, it did not receive a satisfactory 100-hour check on plane NC 1065. Assuming the contract to be divisible, plaintiff forfeits not just the cost of remedying the four defects in NC 1065 but the entire part of the contract price allocable to performance of Item 3 on plane NC 1065.

We reach the same result even if, according to strict contract law theory, the contract is not regarded as divisible. For even if plaintiff's obligation be regarded as entire, it would not follow that plaintiff must, because of the four defects in NC 1065, forfeit the entire consideration for that contract, or even that part of it allocable to NC 1065. The law is not so harsh. See Williston, op. cit., §§ 818, 841. Plaintiff's breach can be adequately compensated for by allowing defendant an appropriate part of the contract price. Defendant itself, in its suggested form of judgment, discussed above, has recognized the feasibility of this. Defendant did not receive a proper 100-hour check on NC 1065 and should not have to pay for it; it received everything else called for in the contract and it should pay for everything it received. The value of the 100-hour check, Item 3, on NC 1065 was $6,194.58. That amount must be deducted from the contract price. We are not disposed to let defendant retain free a performance worth $20,452.76.

Plaintiff is entitled to a judgment for that amount, being the total consideration for the two contracts less the value of that part of contract No. Ilr–1489 which was not satisfactorily performed. It is so ordered.