Fenton GINGERICH, et al., Plaintiffs,

v.

UNITED STATES, Defendant.

Nos. 98–533T, 98–5330 to 98–5350.

United States Court of Federal Claims.

June 22, 2007.

**232**

Teresa J. Womack, Redding & Associates, P.C., Houston, TX, for plaintiffs. With her was Sallie W. Gladney, Redding & Associates, P.C., Houston, TX.

Benjamin C. King, Jr., Tax Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Eileen J. O'Connor, Assistant Attorney General, David Gustafson, Chief, and Mary M. Abate, Assistant Chief, Court of Federal Claims Section, Tax Division, United States Department of Justice, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

The ultimate question in these 22 consolidated tax cases is whether the Internal Revenue Service ("IRS") waited too long after a settlement was entered concerning a partnership item to assess the plaintiffs with additional tax and attendant penalties and interest. To resolve this question, this court must determine when the item was settled. In prior proceedings, a summary disposition was entered in the government's favor, but, on appeal, the Federal Circuit held that a genuine issue of material fact existed as to when settlement occurred and remanded the cases for trial.[1]

In its ruling, the Federal Circuit explicitly mandated that this court conduct further proceedings and make findings respecting specific issues identified by the court of appeals, *viz.*, whether or not the parties required a closing agreement to effectuate the settlement of partnership items before the Tax Court, and, if not, whether a so-called Acceptance Form constituted a valid acceptance of an IRS offer. In accord with this mandate, trial was held on December 11–13, 2006, in Houston, Texas. Following extended post-trial briefing and closing argument, these cases are ready for resolution.

### FACTS[2]

The plaintiffs were certain former direct and indirect partners of the General Information Associates Partnership ("GIA"). The IRS conducted an examination of GIA's partnership returns for tax years 1983 through 1986 and, in April 1990, issued a notice of final partnership administrative adjustment ("FPAA") proposing changes to those returns. The plaintiffs, then represented by Thomas Redding, challenged these adjustments in a partnership-level TEFRA proceeding before the Tax Court.[3]

On January 23, 1991, Mr. Redding broached the possibility of settlement with the IRS's counsel in the Tax Court case. PX 19 (Letter from Redding to William Stoddard, a lawyer in the Manhattan (New York City) District Counsel's office of the IRS

---

1. The government was granted summary judgment as a result of the earlier proceedings on motion before another judge of this court. *See Gingerich v. United States*, 54 Fed.Cl. 222 (2002) (*"Gingerich I"*). On appeal, that judgment was reversed. *See Gingerich v. United States*, 82 Fed. Appx. 35, 2003 WL 22854662 (Fed.Cir.2003) (*"Gingerich II"*). The matter thereafter was reassigned.

2. This recitation of facts constitutes the court's primary findings of fact in accord with Rule 52(a) of the Rules of the Court of Federal Claims ("RCFC"). Other findings of fact and rulings on questions of mixed fact and law are set out in the analysis.

In this opinion, references to plaintiffs' exhibits are to "PX ——" and to defendant's exhibits are to "DX ——." "Tr. ——" refers to the trial transcript.

3. Resolution of controversies concerning partnership matters is governed by the Tax Equity and Fiscal Responsibility Act of 1982, Pub.L. No. 97–248, 96 Stat. 324, 648–671 ("TEFRA") (codified in scattered sections of the Internal Revenue Code ("I.R.C.," found in Title 26 of the United States Code), including especially §§ 6221–34), as amended. *See generally Keener v. United States*, 76 Fed.Cl. at 457–60 (2007) (describing the TEFRA procedures).

(Jan. 23, 1991)).[4] Promptly thereafter, counsel for the IRS responded that the IRS [wa]s prepared to settle this case in the following manner:

1. For the first open year of each partners' investment, the investor will be allowed, to the extent of losses claimed that year, sixty (60) percent of his or her verified out of pocket cash investment in the partnership less the amount of any partnership losses previously allowed. The balance of the sixty percent, if any, is allowed in the immediately succeeding open taxable years until exhausted. For these purposes, the investors' cash investment consists of his or her initial payment made by check plus the principal paid on any recourse notes in favor of the partnership. Interest paid on any notes in favor of the partnership is not a partnership item and not part of the investors' cash investment. This interest may be deductible subject to the applicable limitations contained in section 163.

2. The Government will concede the applicability of the additions to the tax under sections 6653, 6659 and 6661, if any.

3. The investors are required to concede the applicability of the increased rate of interest established under section 6621(c), formerly section 6621(d).

4. No other losses, investment interest expense or other deductions attributable to this partnership shall be allowed in any other year.

5. No income attributable to this partnership shall be reported in any other year except to the extent that an investor receives cash or other property with respect to his or her investment in this partnership.

PX 18 (Letter signed by Bruce Wilpon, IRS Attorney, on behalf of Joseph F. Maselli, IRS

District Counsel, to Redding (Jan. 31, 1991)) at 142–43. The responsive letter also stated that:

> [i]f all of the participating partners agree to the settlement contained in this letter, you should send proof of their verified cash investment and the disposition of any closed prior years to me.... I will then apply the settlement contained in this letter to those partners. I would like to file [with the Tax Court] a Motion for Entry of Decision and proposed Decision by February 28, 1991.

*Id.*

Mr. Redding resisted a deadline of February 28, 1991, calling it "inappropriate" and "untimely," and identified certain information not yet made available, which Mr. Redding had previously requested from the government, that Mr. Redding would require before being able to determine whether to accept the "settlement offer." PX 16 (Letter from Redding to Wilpon (Feb. 12, 1991)) at 137–38; Tr. 958:10–21 (Test. of Redding). Recognizing that the date of February 28, 1991 might have reflected the time limitation within which a partner could request, as of right, a settlement on terms consistent with those another partner received, Mr. Redding stated that "if it is your position that a settlement has been accepted by another partner, forcing us to a February 28 decision date, please send ... immediately a copy of the settlement agreement between the [g]overnment and that partner." PX 16 (Letter from Redding to Wilpon (Feb. 12, 1991)) at 139.

Shortly thereafter, counsel for the IRS in the Tax Court case sent a letter to Babcock MacLean, an attorney representing other partners embroiled in the GIA controversy, and copied the letter to Mr. Redding and Linda Paine, an attorney representing a third group of GIA partners. PX 14 (Letter signed by Stoddard and Wilpon on behalf of

---

4. Mr. Redding sought to preserve his clients' rights under I.R.C. § 6224(c) and Temp. Treas. Reg. § 301.6224(c)–3T to enter into a settlement agreement with the IRS on terms consistent with those entered by another partner of the partnership for the tax year. *See* PX 19 (Letter from Redding to Stoddard (Jan. 23, 1991)) at 146–47.

By temporary regulation, a partner wishing to enter a consistent settlement as of right must file a request not later than "[t]he 60th day after the day on which the settlement agreement was entered into." Temp. Treas. Reg. § 301.6224(c)–3T(c)(3)(ii).

Maselli to MacLean (Mar. 11, 1991)) at 134.[5] The letter sent by Messrs. Stoddard and Wilpon refers to a meeting they had had with Messrs. MacLean and Redding and Ms. Paine and advised that "the settlement offer remains outstanding" but reserved the government's right to withdraw, by a writing, the settlement offer "as of a date [the IRS] decide[s]." *Id.*

Mr. Redding requested that the IRS's counsel "clarify[ ]" any "ambiguity ... regarding precisely what the settlement being offered by the IRS actually [wa]s." PX 12 (Letter from Redding to Stoddard and Wilpon (July 5, 1991)) at 81. To that correspondence, Mr. Redding attached a draft document styled "Closing Agreement on Final Determination Covering Specific Matters." *Id.* at 87–90. The text of Mr. Redding's draft did not correspond word-for-word with the terms of the offer communicated by Mr. Wilpon on January 31, 1991. Mr. Redding commented that,

[i]f we can work with this as a basic draft, we should be able to agree to a suitable format to be used whether or not you agree to my proposed revised settlement offer, or if we proceed only after the [statute of] limitations issue [pending on motion before the Tax Court] is resolved. I have prepared the draft according to my proposal....

I would like to resolve the format immediately if possible, as there may be one or more partners who will take the present offer rather than challenge limitations.

*Id.* at 85–86. At trial, Mr. Redding testified that he "did not intend [this proposal] as a counteroffer or as a rejection of the settlement." Tr. 957:17–19, 968:22–24 (Test. of Redding).

The IRS's counsel responded, stating "[y]our counter-offer is rejected." PX 11 (Letter signed by Stoddard and Wilpon on behalf of Maselli to Redding (Oct. 17, 1991)) at 78; *see Gingerich II*, 82 Fed.Appx. at 37 ("A series of counteroffers by Redding, and corresponding rejections by the IRS, ensued."). The IRS's counsel also clarified that "no settlement agreements ... ha[d] been

formally accepted on behalf of the Commissioner with respect to this partnership, to date." PX 11 at 78. Citing Mr. Redding's then-pending motion before the Tax Court, which motion asserted the IRS had failed to make certain assessments within the applicable statute of limitations, Messrs. Stoddard and Wilpon stated that the "existing settlement offer will remain open for a reasonable period of time after the motion is decided" unless the government was "required to call *any* witnesses," in which case "the current settlement offer will be irrevocably withdrawn *at that time.*" *Id.* at 78–79. The letter advised that plaintiffs "may, of course, accept the current settlement offer any time prior to any hearing or trial [before the Tax Court]." *Id.* at 79.

At trial in this matter, the parties offered differing interpretations of the words "offer" and "settlement offer" as used by Messrs. Stoddard and Wilpon. Mr. Redding testified that he understood that "offer" was used in the IRS counsel's letters to carry its formal legal meaning and not simply to convey an invitation for further negotiations. Tr. 969:2–14 (Test. of Redding). According to Mr. Stoddard, however, "[i]t was assumed ... [b]y everyone ... [that a] closing agreement was part and parcel of any settlement agreement that we had.... [T]here was never any meeting of the minds that I was going to settle partnership items via an exchange of letters and other items using a closing agreement." Tr. 493:21 to 494:19 (Test. of Stoddard); *see also id.* at 494:4–6 ("I don't have to tell Mr. Redding to use a spoon to eat soup. He just knows to do it.").

In September 1992, the Tax Court rendered a decision denying Mr. Redding's motion for partial summary judgment. *See General Info. Assocs. P'ship v. Commissioner*, 64 T.C.M. (CCH) 957, 1992 WL 238777 (1992). Thereafter, Messrs. Stoddard and Wilpon requested that Mr. Redding "inform [the IRS] in writing of [his] decision to accept or reject the settlement offer previously extended in this case on or before December 1, 1992." PX 10 (Letter signed by Stoddard

5. In the Tax Court proceeding, Mr. Redding and Ms. Paine coordinated their discovery and certain motions with Mr. MacLean. Tr. 959:19 to 960:3 (Test. of Redding).

and Wilpon on behalf of Maselli to Redding (Oct. 22, 1992)) at 76. Mr. Redding testified that he viewed this statement "as a drop-dead, take-it-or-leave-it settlement offer that we either [would] accept or we [would not] have a right to in the future." Tr. 971:17–19 (Test. of Redding); *see also* Tr. 972:21 to 973:6 (Test. of Redding).

At this juncture, Ms. Paine, Mr. MacLean, and Mr. Redding were separately corresponding with Messrs. Stoddard and Wilpon. *See* DX 1 (Letter from Paine to Wilpon and Stoddard (Nov. 12, 1992)) at 271–72; PX 9 (Facsimile from Redding to Wilpon and Stoddard (Nov. 13, 1992)) at 73–74; PX 4 (Letter signed by Wilpon on behalf of Maselli to MacLean (Dec. 18, 1992)) at 61. By a letter dated November 12, 1992, Ms. Paine informed the IRS's counsel that she, Mr. MacLean, and Mr. Redding were recommending to their respective clients that they settle with the IRS based on the terms set forth in the letter sent by Messrs. Stoddard and Wilpon to Redding on January 31, 1991. DX 1 (Letter from Paine to Wilpon and Stoddard (Nov. 12, 1992)) at 271. She indicated that this recommendation was being made "on the condition that an appropriate Closing Agreement can be entered into making certain that our clients do not have to report any income or gains from the partnership in any year, unless they actually received cash from the partnership." *Id.* at 272. A draft closing agreement was attached to this letter. *Id.* at 273–75. Ms. Paine testified that she believed she was writing on behalf of Mr. MacLean and Mr. Redding but that Mr. Redding was "his own man" and that she did not have authority to settle on behalf of Mr. Redding's clients. Tr. 426:4–5; 427:17–22 (Test. of Paine). In terms of actually effectuating the settlement for her own clients, Ms. Paine testified that she "didn't want to settle any item on the table without making sure [she] had a closing agreement to settle items that were not part of the partnership proceeding," Tr. 428:22–25 (Test. of Paine), because she "had a little different concern and balanced the issues a little differently" than Mr. Redding did. Tr. 429:24 to 430:1 (Test. of Paine). Ms. Paine maintained that, as of this point in time, the IRS

had not specified the method for acceptance of its offer. Tr. 433:10–20 (Test. of Paine).

In March 1991, Mr. MacLean had confirmed that the settlement offer made by the IRS's counsel remained open for acceptance. *See* PX 15 (Letter from MacLean to Stoddard and Wilpon (Feb. 26, 1991)) ("It is our further understanding that your current offer of settlement will not be withdrawn prior to the time of trial.") at 136; PX 14 (Letter from Stoddard and Wilpon to MacLean (March 11, 1991) ("There may come a time when we feel that settlement negotiations are no longer productive. At that time, we will inform you in writing that the settlement offer will be withdrawn as of a date we decide. In the interim, the settlement offer remains outstanding.")) at 134. Subsequently, in December 1992, after The Tax Court in September 1992 had rendered its decision on the pending motion in the *General Information Associates* case, Mr. MacLean sent a letter to the IRS's counsel indicating "[his] clients' desire to accept the IRS settlement previously extended." PX 4 (Letter from Wilpon to MacLean (Dec. 18, 1992)) at 61 (reciting the gist of a letter sent by Mac-Lean).

Mr. Redding similarly hastened to respond before the deadline set by the IRS's counsel, but his response took a more definite step toward completion of an agreement. Mr. Redding prepared what he described as "a form letter for acceptance of [the IRS's] offer for [his] clients to execute" and sent via facsimile a draft of that letter ("the Redding Acceptance Form") to the IRS's counsel. PX 9 (Facsimile from Redding to Wilpon and Stoddard (Nov. 13, 1992)) at 73–75. In the transmittal, Mr. Redding requested that "you please confirm by fax that a letter in this form received in your office within the time specified would constitute a valid acceptance of the settlement." *Id.* at 73. Mr. Redding explained in his testimony that his "concern . . . in requesting that they vet the representation in the form I sent to my client was I wanted to be sure that we were clear on what the terms were and that I wouldn't be in a position of misrepresenting those terms to the client among other things in getting him to accept it . . . . [so that] there couldn't be

any dispute as to what the settlement was that was being accepted and what the terms were." Tr. 973:12–23 (Test. of Redding).

In the same communication, Mr. Redding also recited "[n]otwithstanding my willingness to recommend settlement, I would like to reinforce ... that a Closing Agreement be used in order to resolve all issues that are not partnership item issues and therefore are not before the [Tax] Court." PX 9 (Facsimile from Redding to Wilpon and Stoddard (Nov. 13, 1992)) at 73. Mr. Redding testified that though the method by which his clients were to accept the government's offer had "not [been] specified," Tr. 973:7–9 (Test. of Redding), he had "want[ed] a closing agreement to be sure that all issues that [we]re not partnership item issues and therefore not before the [Tax] Court in this [partnership-level] proceeding [we]re covered." Tr. 974:18–21 (Test. of Redding). Mr. Redding explained, "At this point, we [we]re still the ones asking for a closing agreement. The government ha[d] never asked us for one, never said we needed to use one." Tr. 974:10–13 (Test. of Redding). To provide time to communicate with his clients, Mr. Redding requested a thirty-day extension of the time to respond set by Messrs. Stoddard and Wilpon in their letter of October 22, 1992. PX 9 (Facsimile from Redding to Wilpon and Stoddard (Nov. 13, 1992)) at 74.

The text of Mr. Redding's draft acceptance form largely mirrored the language of Mr. Wilpon's letter of January 31, 1991, except that Mr. Redding added a sixth term: "Any gains reported in years subsequent to the initial investment year shall be reversed and not included in income." *Compare* PX 18 (Letter from Wilpon to Redding (Jan. 31, 1991)) at 142–43, *with* PX 9 (Facsimile from Redding to Wilpon and Stoddard (Nov. 13, 1992)) at 75B. At trial, Mr. Redding explained that the sixth term was really not a new term but "a recitation of the same thing that's in [term number] 5 .... [,] just [a] clarification of th[e] point that income here is meant to refer to both income and capital gain if we're talking about capital gains." Tr. 977:11–24 (Test of Redding). Mr. Redding testified that he prepared the correspondence of November 13, 1992, with the intention of "n[o]t ... do[ing] anything to disturb th[e] ability to accept [the pending] offer" but wishing to "protect [his clients] on the nonpartnership items." Tr. 976:10–13 (Test of Redding).

Mr. Wilpon replied by facsimile, informing Mr. Redding that the IRS "agree[d] with your [*i.e.*, his] outline of the settlement terms set out in the Draft Acceptance Form." PX 8 (Facsimile from Wilpon to Redding (Nov. 17, 1992)) at 70. This transmission also conveyed that the IRS would permit the 30–day extension Mr. Redding sought and included an attachment, which was described as "our anticipated closing agreement language." *Id.* Mr. Wilpon testified that he sent this attachment because "it was my intention and I believed it was everybody's understanding that there had to be this executed closing agreement." Tr. 682:1–3 (Test. of Wilpon).

In contrast, by December 18, 1992, Mr. MacLean and the IRS's counsel had agreed to use closing agreements to effectuate settlement with Mr. MacLean's clients. PX 4 (Letter from Wilpon to MacLean) (Dec. 18, 1992) (containing reference to "investor settlements (*e.g.*, closing agreements)").

Mr. Redding sent a Redding Acceptance Form to each of his clients with the recommendation that they sign and return the document to him. *See, e.g.*, PX 162 (Letter from Redding to Choong K. Kim (Dec. 1, 1992)) at 2696–2715. The plaintiffs each relied on Mr. Redding's representations and advice. *See* Tr. 287:24 to 288:7 (Test. of Roy Chaplin) (referring to reliance of Mr. and Mrs. Gingerich on professional expertise);[6] Tr. 223:22–23 (Test. of Paul Demshar) (Dr.

---

**6.** Testimony at trial established that six plaintiffs, Mr. Gingerich, Ms. Belle Liebovich, Mr. Joe Liebovich, Mr. Carl Liebovich, Mrs. Karl, and Mr. Scruggs, are deceased. Tr. 286:21 (Test of Chaplin); Tr. 45:20–21 (Test of Doran); 186:18–20; Tr. 202:24 to 203:3 (Test. of Lou Liebovich); 219:17–18 (Test of Demshar); Tr. 112:16–25 (Test. of Gregory Liebovich). The executors or administrators of their estates accordingly should be substituted as parties in their cases (Nos. 98–533 (Fenton Gingerich), 98–5342 (Belle Liebovich), 98–5341 (Joe Liebovich), 98–5337 (Carl Liebovich), 98–5332 (Young Ho Karl), and 98–5348 (Charles Scruggs)) included in this consolidated action. *See* RCFC 25(a).

and Mrs. Karl "totally relied on Mr. Redding and Mr. Redding's advice."); Tr. 241:2–23 (Test. of Paul Demshar) (Dr. and Mrs. Kim "would just then rely on Mr. Redding."); Tr. 91:10–13 (Test. of Greg Liebovich) (LouBess, Inc. accepted and followed Mr. Redding's advice and recommendations); Decl. of Eugene Rosol (Mar. 22, 2007) ("I deferred to and followed Mr. Redding's advice as to how to handle this matter.") at 1; Tr. 48:8–10 (Test. of Stephanie Doran) (Mr. Scruggs would have accepted and followed Mr. Redding's legal advice); Tr. 66:19–20; 80:8–11 (Test. of Dr. Yoon) (Mr. and Dr. Yoon relied on their certified public accountant, Mr. Demshar, and their attorney, Mr. Redding, and, by completing the Redding Acceptance Form, thought they were accepting the settlement.).

On December 30, 1992, Mr. Redding mailed the acceptance letters from his clients to Mr. Wilpon. PX 7 (Letter from Redding to Wilpon (Dec. 30, 1992)) at 68.[7] Each Redding Acceptance Form contained a request that counsel for the IRS sign and return a copy of the document to "acknowledge timely receipt of [the taxpayer's] acceptance on behalf of the Commissioner of Internal Revenue." *See, e.g.*, PX 36A (Letter from Seung Karl to Wilpon and Stoddard (Dec. 29, 1992)) at 3. Mr. Redding reiterated this request in his cover letter: "I would appreciate it if you would countersign the copy of each of the acceptance letters and return them to me as soon as possible." PX 7 (Letter from Redding to Wilpon (Dec. 30, 1992)) at 68.

The acceptance forms were not signed by anyone on behalf of the IRS. Mr. Wilpon testified that the forms were not signed and returned "because it was always our position

that you needed the closing agreement to effectuate a settlement." Tr. 673:10–17 (Test. of Wilpon).

On January 26, 1993, Mr. Wilpon sent Mr. Redding closing agreements for those clients of his who had submitted substantiation of their cash investments. PX 6 (Letter signed by Wilpon on behalf of Maselli to Redding (Jan. 26, 1993)) at 67. The transmittal letter included the reservation, "It should be understood that this settlement is subject to review and acceptance on behalf of the [IRS]." *Id.*[8] Mr. Redding testified that he "went ballistic" upon reading the qualification regarding settlement being subject to IRS acceptance. Tr. 1025:4 (Test. of Redding). He "thought we had a binding fixed agreement." Tr. 1025:16–17 (Test. of Redding). The closing agreements themselves came as no surprise to Mr. Redding. At trial, Mr. Redding explained:

> [W]e've always done it that way.... When we have executed a final closing agreement like this, just as we did in the *Hillcrest* cases,[9] we rolled in the terms that had already been agreed to in the settled Court case [*i.e.*, terms pertaining to partnership items] and expressed them as well as the remainder of the terms [*i.e.*, terms concerning non-partnership items] that would not have been enforceable without appeals authorization or at least conceptually would not have been enforceable without reliance on trying to prove up an equitable estoppel argument or an estoppel argument.

Tr. 1023:25 to 1024:12 (Test. of Redding).

On March 17, 1993, Mr. Redding responded to this and a subsequent letter in which Mr. Wilpon stated that "no settlement occurs

---

7. Plaintiff Eugene Rosol "sent [his] acceptance directly to the IRS." Decl. of Eugene Rosol (Mar. 22, 2007) at 2.

8. Mr. Wilpon testified that once IRS personnel "became aware of *Treaty Pines [Investments P'ship v. Commissioner*, 967 F.2d 206 (5th Cir. 1992) (Sneed, J.)]," communications sent on behalf of the IRS started including "the language regarding there's no settlement until the closing agreement is executed by the government's representative." Tr. 329:11–17 (Test. of Wilpon). *Treaty Pines* was decided by the Fifth Circuit on August 5, 1992. That decision held that taxpay-

ers "could settle their case with respect to th[os]e partnership items [then before the Tax Court] without a closing agreement, and without regard to whether a closing agreement was contemplated or completed as to affected items and interest." 967 F.2d at 212 (citing *Haiduk v. Commissioner*, 60 T.C.M. (CCH) 864, 865–66 (1990)).

9. The litigation culminating in *Treaty Pines* was one of the so-called *Hillcrest* cases, which concerned "partnerships that had been involved with the Hillcrest Government Securities trading program." *See Treaty Pines*, 967 F.2d at 207–08.

until closing agreements are signed by your clients and countersigned by the appropriate Service representative." PX 5 (Letter signed by Wilpon on behalf of Maselli to Redding (Feb. 18, 1993)) at 66; *see* PX 3 (Letter from Redding to Wilpon (Mar. 17, 1993)) at 57. Mr. Redding challenged two provisions of the closing agreements as "inconsistent with the terms of settlement" and questioned whether the IRS was "attempt[ing] to repudiate the settlement that you offered and my clients accepted." PX 3 (Letter from Redding to Wilpon (Mar. 17, 1993)) at 57–58. Nonetheless, Mr. Redding pledged to "in good faith make every effort to cooperate with you in implementing closing agreements which, as I indicated many times, I believe are essential to carry out the agreement entered into by my clients because of the effect of that agreement on years subsequent to the docketed Tax Court case." *Id.* at 58. Mr. Redding expressed his view that "the terms of that settlement have been firmly and adequately discussed previously and should not now be subject to renegotiation, and I believe your offer of settlement and my clients' acceptances are sufficient to bind you to those terms." *Id.* At trial, Mr. Redding testified that after discussing the two provisions he originally thought were inconsistent with counsel for the IRS, he came to realize that there was no inconsistency. Tr. 979:5 to 980:8 (Test. of Redding). By summer, Mr. Redding had acknowledged his "error" to the IRS's counsel and announced he would "recommend that [his] clients accept the closing agreements that [the IRS had] sent." PX 161 (Letter from Redding to Wilpon (June 7, 1993)); Tr. 998:19 to 999:1 (Test. of Redding).

The individual plaintiffs signed the closing agreements at various times from July to September 1993. *See* PX 23 (Form 906, Closing Agreement on Final Determination Covering Specific Matters) ("Form 906") (signed by representative of Lou Bess, Inc., on Aug. 12, 1993) at 170–74; PX 25 (Form 906) (signed by Fenton and Eunice Gingerich on Jul. 13, 1993 and July 16, 1993, respective-

ly) at 180–84; PX 37 (Form 906) (signed by a representative of Seung C. and Yung Ho Karl on July 19, 1993, and the Karls themselves on Aug. 2, 1993) at 428–31; PX 47 (Form 906) (signed by Choong H. and Joung S. Kim on Sept. 3, 1993) at 545–48; PX 133 (Form 906) (signed by Charles S. Scruggs on July 12, 1993) at 2109–13; PX 146 (Form 906) (signed by Dae–Sob and Moon K. Yoon on July 19, 1993) at 2444–47.[10] Mr. Redding sent these signed closing agreements, along with similar ones for clients who are not plaintiffs in the present case, to Mr. Wilpon on September 10, 1993. PX 2 (Letter from Redding to Wilpon (Sept. 10, 1993)) at 2–5, 13–22, 28–31, 42–46, 51–55; Tr. 999:16–23 (Test. of Redding).

In transmitting the closing agreements to the IRS Appeals Office for "Execution of Closing Agreement[s] & Removal of Tefra Linkages," Mr. Wilpon warned his colleagues at the IRS that he "anticipate[d] that the taxpayers w[ould] make a *Treaty Pines Investment* type argument." PX 156 (Form 1734, Transmittal Memorandum, Wilpon to Pinero (undated)) at 2689. Accordingly, Mr. Wilpon recommended that "any assessments made as a result of these closing agreements should be made [before No]vember 1, 1993." *Id.*; *see also* Tr. 663:7 to 667:21 (Test. of Wilpon). On September 22, 1993, an IRS representative signed these closing agreements, and they became effective. *See, e.g.,* PX 23 (Closing Agreement for LouBess, Inc.) at 173; PX 25 (Closing Agreement for Fenton and Eunice Gingerich) at 183.

The assessments were not made with the alacrity urged by Mr. Wilpon. *See* DX 3 (Forms 2866, Certificate of Official Record) ("Forms 2866") (prepared respecting Fenton and Eunice Gingerich for tax years 1983–86, showing tax assessed on May 30, 1994 and June 27, 1994) at 12–21; DX 4 (Forms 2866) (prepared respecting Seung C. and Yung Ho Karl for tax years 1984–86, showing tax assessed on May 23, 1994 and June 6, 1994) at 22–28; DX 5 (Forms 2866) (prepared respecting Choong H. and Joung S. Kim for tax years 1983–86, showing tax assessed on

---

10. Mr. Rosol signed a Closing Agreement before Mr. Redding's other clients. *See* PX 113 (Form 906) (signed by Eugene M. Rosol for himself and as executor for the estate of his late wife Ritamae Rosol on Feb. 10, 1993, and signed on behalf of the IRS on Mar. 10, 1993) at 1861–68.

June 13, 1994 and June 20, 1994) at 29–40; DX 7 (Forms 2866) (prepared respecting Albert and Dorothy Liebovich for tax years 1983–85, showing tax assessed on Mar. 14, 1994) at 58–87; DX 8 (Forms 2866) (prepared respecting Carl V. and Nelle Liebovich for tax years 1985–86, showing tax assessed on Mar. 14, 1994) at 88–101; DX 9 (Forms 2866) (prepared respecting Gregory and Gail Liebovich for tax years 1983–86, showing tax assessed on Apr. 25, 1994) at 102–29; DX 10 (Forms 2866) (prepared respecting Samuel D. and Erna S. Liebovich for tax years 1983–85, showing tax assessed on Apr. 11, 1994 and Apr. 18, 1994) at 130–50; DX 11 (Forms 2866) (prepared respecting Larry J. and Barbara J. Liebovich for tax years 1983–85, showing tax assessed on Mar. 7, 1994) at 151–71; DX 13 (Forms 2866) (prepared respecting Charles H. Scruggs for tax years 1983–86, showing tax assessed on May 30, 1994) at 176–195; DX 14 (Forms 2866) (prepared respecting Dae S. and Moon K. Yoon for tax years 1983–85, showing tax assessed on Aug. 8, 1994) at 196–209.[11]

Contemporaneously with action on the closing agreements, on September 7, 1993, the Tax Court had issued an order requiring all GIA partners before it, which partners included the plaintiffs in these cases, to designate a new tax matters partner. Order, *General Info. Assocs. v. Commissioner*, No. 18405–90 (T.C. Sept. 7, 1993). Mr. Redding responded by informing the Tax Court that his clients had "entered into a settlement agreement with the Internal Revenue Service in December of 1992" and that "Closing Agreements relative to [his clients had been] executed by the IRS." Report to the Court, *General Info. Assocs.*, No. 18405–90 (T.C. Oct. 14, 1993). Because of the settlements, Mr. Redding advised the Tax Court his clients were "no longer participants to this proceeding and anticipate[d] taking no further action with regard to the determination of a tax matters partner." *Id.* Ultimately, the plaintiffs in these cases were dismissed as parties to the Tax Court proceeding because their settlements caused the Tax Court to lack subject matter jurisdiction over their petitions. Order, *General Info. Assocs.*, No. 18405–90 (T.C. Feb. 23, 1994). Although taking note of the dispute between the taxpayers and the government as to the effective date of the settlements, the Tax Court explicitly declined "to determine the date or dates on which those agreements were entered into for the purpose of dismissing this case for lack of jurisdiction" because it was necessary only to "determine[ ] that such agreements had been entered into prior to February 23, 1994," the date of the dismissal order. Order, *General Info. Assocs.*, No. 18405–90 (T.C. Apr. 11, 1994).

Each of the 22 plaintiffs paid the additional taxes sought along with the corresponding interest and penalties, filed administrative refund claims with the IRS, received notice of disallowance of the claims from the IRS, and, on June 19, 1998, filed a refund suit in this court. In due course, the parties filed cross-motions for summary judgment, chiefly contesting the timing of the settlement as against the subsequent assessments. The court awarded summary judgment to the government, finding that "on December 30, 1992, the parties had not mutually assented to the material terms of a settlement agreement, and thus, no contract was created on that date." *Gingerich I*, 54 Fed.Cl. at 229. Instead, the court found that "the parties clearly contemplated the need to execute a closing agreement to finalize the settlement" and therefore "the relevant settlement was not final until September 22, 1993, when a representative from the IRS signed the closing agreements." *Id.* The court held that because the pertinent assessments had been made within one year of that date, the IRS

---

11. LouBess, Inc., a partner in GIA, was treated as an S-corporation for federal income tax purposes. *See* Tr. 87:8–9 (Test. of Greg Liebovich). The evidence adduced at trial, DX 6 (Forms 2866) (prepared respecting LouBess, Inc. for tax years 1983–86) at 41–57, shows multiple "audit deficiency" assessments listed for March 21 and 28, 1994. No dollar amounts are included, presumably because LouBess, Inc. was treated as an S-corporation and its shareholders, not LouBess, Inc., were responsible for taxes attributable to LouBess's share of GIA items.

The IRS issued its assessment to Mr. Rosol earlier than to Mr. Redding's other clients. *See* DX 12 (Forms 4340, Certificate of Assessments and Payments) (showing audit deficiency assessed on Jan. 3, 1994, for tax years 1983–86) at 172–75.

was not time-barred. *Id.; see also* I.R.C. §§ 6229(f); 6231(b)(1) (setting forth period during which IRS may assess income taxes pertaining to partnership items that are the subject of a settlement agreement between a partner and the Secretary).

On appeal, the Federal Circuit reversed, concluding that the premise that "Redding's clients and the IRS clearly 'contemplated the need to execute a closing agreement to finalize the settlement' " was a "factual assertion [in] dispute[ ]" without "conclusive support in the record" and that, accordingly, that dispute could not be resolved on summary judgment. *Gingerich II,* 82 Fed.Appx. at 39. The Federal Circuit remanded the case for further proceedings with the direction that this court should make "specific findings concerning whether or not the parties required a closing agreement to effectuate the settlement of issues before the Tax Court." *Id.* The Federal Circuit instructed that if this court "concludes that a closing agreement was not required, the court should then determine if the Redding Acceptance Form constituted a valid acceptance of the IRS Offer despite the variations in terms between the two documents." *Id.* Upon remand, the case was reassigned, and evidence on the disputed issues was adduced during a three-day trial.

### Standards for Decision

"A tax refund suit is a *de novo* proceeding, in which the plaintiff bears the burden of proof, including both the burden of going forward and the burden of persuasion." *Sara Lee Corp. v. United States,* 29 Fed.Cl. 330, 334 (1993) (citing *Helvering v. Taylor,* 293 U.S. 507, 515, 55 S.Ct. 287, 79 L.Ed. 623 (1935) (burden of proof)); *see also Lewis v. Reynolds,* 284 U.S. 281, 283, 52 S.Ct. 145, 76 L.Ed. 293 (1932), *modified by* 284 U.S. 599, 52 S.Ct. 264, 76 L.Ed. 514 (1932) (burden of proof); *Rockwell v. Commissioner,* 512 F.2d 882, 885 (9th Cir.1975) (Duniway, J.) (burden of proof); *George E. Warren Corp. v. United States,* 135 Ct.Cl. 305, 141 F.Supp. 935, 940 (1956) *(de novo); Snap–On Tools, Inc. v. United States,* 26 Cl.Ct. 1045, 1055 (1992) (burden of proof). "A plaintiff who is claiming a tax refund must prove [its] case by a preponderance of the evidence." *Ebert v. United States,* 66 Fed.Cl. 287, 291 (2005) (citing *Cook v. United States,* 46 Fed.Cl. 110, 116 (2000)).

In this instance, as recognized by the Federal Circuit in *Gingerich II,* the identification of the date each plaintiff entered a settlement agreement with the IRS controls the necessary determination of the plaintiffs' tax obligations. 82 Fed.Appx. at 39. "As contracts, tax settlements are governed by general principles of contract law." *Id.* (citing *Treaty Pines,* 967 F.2d at 211); *see also Franconia Assocs. v. United States,* 536 U.S. 129, 141, 122 S.Ct. 1993, 153 L.Ed.2d 132 (2002) ("When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals.") (quoting *Mobil Oil Exploration & Producing Se., Inc. v. United States,* 530 U.S. 604, 607, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000)). The question of when contracts between the taxpayers and the IRS were actually formed is a mixed question of law and fact. *See Caroline Hunt Trust Estate v. United States,* 470 F.3d 1044, 1049 (Fed.Cir. 2006) ("The existence of a contract is a mixed question of law and fact.") (citing *La Van v. United States,* 382 F.3d 1340, 1345 (Fed.Cir. 2004)). Plaintiffs, who allege the existence of contracts at a date the government resists, bear the burden of proving the factual elements of contract by a preponderance of the evidence. *See Harbert/Lummus Agrifuels Projects v. United States,* 142 F.3d 1429, 1434 (Fed.Cir.1998) ("The party alleging the existence of a contract has the burden."); *Thomas v. Nicholson,* 423 F.3d 1279, 1283 (Fed.Cir.2005) ("The 'preponderance of the evidence' formulation is the general burden assigned in civil cases for factual matters.") (quoting *St. Paul Fire & Marine Ins. Co. v. United States,* 6 F.3d 763, 769 (Fed.Cir. 1993)).

### ANALYSIS

Congress has statutorily limited the time within which the IRS may assess a taxpayer with income taxes attributable to a partner-

ship item or an affected item.[12] Generally, the IRS has three years "after the later of— (1) the date on which the partnership return for such taxable year was filed, or (2) the last day for filing such return for such year (determined without regard to extensions)." I.R.C. § 6229(a). This time period is suspended once a "notice of a final partnership administrative adjustment ... is mailed to the tax matters partner ... (1) for the period during which an action may be brought under section 6226 [seeking judicial review of the FPAA] (and, if a petition is filed ..., until the decision of the court becomes final), and (2) for 1 year thereafter." I.R.C. § 6229(d). However, Congress has established a special rule for the timing of assessments when partnership items become non-partnership items:

> [i]f before the expiration of the period otherwise provided in this section for assessing any tax imposed by subtitle A [i.e., income taxes] with respect to the partnership items of a partner for the partnership taxable year, such items become nonpartnership items by reason of 1 or more of the events described in subsection (b) of section 6231, the period for assessing any tax imposed by subtitle A which is attributable to such items (or any item affected by such items) shall not expire before the date which is 1 year after the date on which the items become nonpartnership items.

I.R.C. § 6229(f)(1). One of the events described in subsection (b) of section 6231, which events operate to transform partnership items into non-partnership items for a partner for a particular taxable year, occurs when "the Secretary [of the Treasury] enters into a settlement agreement with the partner with respect to such items." I.R.C. § 6231(b)(1)(C) (1988).[13] Therefore, the IRS had one year after the date on which a settlement agreement was entered respecting GIA partnership items during which to assess any applicable taxes.

All parties agree that a settlement agreement was entered in this case. The salient question of when such an agreement was reached regarding GIA partnership items turns on contract law.

### A. Meeting of the Minds

"[E]xchanges between the government and [a private party] 'constitute a contract only if three elements are met: mutual intent to contract including an offer and acceptance, consideration, and a government representative who had actual authority to bind the government.'" *Caroline Hunt Trust Estate*, 470 F.3d at 1049 (quoting *La Van*, 382 F.3d at 1346) (footnote omitted). Plaintiffs argue that Mr. Wilpon's letter of January 31, 1991, PX 18 (Letter from Wilpon to Redding (Jan 31, 1991)) at 142–43, was an offer, which Mr. Redding and his clients had the power to accept, and that, by the return of the Redding Acceptance Forms, his clients did accept. Pls.' Post–Tr. Br. at 7, 18–19; Pls.' Post–Tr. Resp. at 6. By contrast, the government's filings with the court generally avoid describing Mr. Wilpon's letter of January 31, 1991, as an "offer" but instead refer to it as a "proposal." *See, e.g.,* Def.'s Post–Tr. Br. at 4, 6, 7. The government maintains that none of the proposed terms were susceptible to acceptance except by a closing agreement. *Id.* at 9.

" '[I]n any given circumstance, who is the offeror, and what constitutes a definite offer,

---

12. Under TEFRA, "partnership items" are resolved at a partnership-level proceeding. I.R.C. §§ 6221, 7422(h); *see Prochorenko v. United States*, 243 F.3d 1359, 1363 (Fed.Cir.2001); *Keener*, 76 Fed.Cl. at 458–59. By contrast, non-partnership items are resolved at the individual-partner level. *See Crnkovich v. United States*, 202 F.3d 1325, 1328–29 (Fed.Cir.2000). A further category of items falls between these two poles. "Affected items" are hybrids that depend upon a partnership-level determination but also have a non-partnership aspect. *See, e.g., Keener*, 76 Fed. Cl. at 460–61 (citing *Katz v. Commissioner*, 335 F.3d 1121, 1124 (10th Cir.2003)); *GAF Corp. & Subs. v. Commissioner*, 114 T.C. 519, 528, 2000 WL 863148 (2000); Arthur B. Willis, John S. Pennell & Philip F. Postlewaite, *Partnership Taxation* ¶ 20.02[4][c] (6th ed.1999).

13. Congress amended I.R.C. § 6231(b)(1)(C) to add "or the Attorney General (or his delegate)" after "Secretary." Job Creation and Worker Assistance Act of 2002, Pub.L. 107–147, § 416(d)(1)(C), 116 Stat. 21, 55 (2002). This change is applicable with respect to settlement agreements entered into after March 9, 2002, *id.* § 416(d)(2), and thus it does not apply to these cases.

requires looking closely at the language of the proposal itself. . . . Differing phrases are evidence of differing intent, but no one phrase is necessarily controlling.' " *Enzo Biochem, Inc. v. Gen–Probe, Inc.*, 424 F.3d 1276, 1282 (Fed.Cir.2005) (quoting *Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1048 (Fed.Cir.2001)). While "[a]n offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it," *Restatement (Second) Contracts* § 24, at 71 (1981) (quoted by *Anderson v. United States*, 344 F.3d 1343, 1353 (Fed.Cir.2003)), "[a] manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent." *Restatement (Second) Contracts* § 26, at 75 (quoted by *Linear Tech. Corp. v. Micrel, Inc.*, 275 F.3d 1040, 1050 (Fed.Cir.2001)). And, "[w]hile an offeror may prescribe the method of acceptance, if no method is specified, an offeree may accept in any reasonable manner." *Kansas Power & Light Co. v. Burlington N.R.R.*, 740 F.2d 780, 787 (10th Cir.1984) (citing 1 A. Corbin, *Corbin on Contracts*, § 88 (1963)); *see also Restatement (Second) Contracts*, §§ 50, 60 at 128, 147.

■ Mr. Wilpon's letter of January 31, 1991 sets forth definite terms for settlement, indicative of an intent to create an offer. *See* PX 18 (Letter from Wilpon to Redding (Jan. 31, 1991)) at 142–43; *see also Tree Farm Dev. Corp. v. United States*, 218 Ct.Cl. 308, 585 F.2d 493, 500 (1978) ("For there to be [an] express contract, the parties must have intended to be bound and must have expressed their intention in a manner capable of understanding. A definite offer and an unconditional acceptance must be established." (quoting *Russell Corp. v. United States*, 210 Ct.Cl. 596, 537 F.2d 474 (1976))). Counsel for the IRS reaffirmed this offer on a number of occasions thereafter. *See, e.g.,* PX 10 (Letter from Stoddard and Wilpon to Redding (Oct. 22, 1992)) at 76 ("Please inform us in writing of your decision to accept or reject the settlement offer previously extended in this case on or before December 1,

1992."); PX 8 (Facsimile from Wilpon to Redding (Nov. 17, 1992)) at 70 ("[W]e agree to your request for an additional 30 days to solicit acceptance of the settlement."). Identifying a deadline after which the settlement offer would be withdrawn is another indicium of the intent of the government to extend an offer.

Furthermore, the communications by the IRS's counsel bore no language of reservation regarding intent. *Cf. Rennick v. O.P.T.I.O.N. Care, Inc.*, 77 F.3d 309, 316 (9th Cir.1996) (Letter stating " 'this letter of intent is of no binding effect on any party hereto' . . . . shows that the parties intended not to be bound . . . unless and until a subsequent agreement was made and was approved."); *Amber Chemical Inc. v. Reilly Industries, Inc.*, 2007 WL 512410, at *5 (E.D.Cal. Feb.14, 2007) ("[E]-mail did not constitute an offer because it merely invited the parties to 'work[ ] out a contract,' . . . [and] evidenced only a willingness to 'discuss this proposal.' [The sender] did not 'intend to conclude a bargain until he [had] made a further manifestation of assent.' As such, th[e] e-mail . . . is no more than an invitation to negotiate."). In the *Restatement (Second) Contracts*, Section 26, quoted *supra*, setting out precepts for a manifestation of willingness to enter into a bargain that is not an offer, " 'reason to know' is to be understood with reference to the course of performance, and prior dealings between parties." *Dean Foods Co. v. Brancel*, 187 F.3d 609, 619 (7th Cir.1999) (discussing *Restatement (Second) Contracts* § 26).

Mr. Wilpon's letter of January 31, 1991 also included unambiguous language indicating that, at least as to the first paragraph, acceptance would engender closure of the tax dispute as to the agreeing partners, along with resolution of the Tax Court case. *See* PX 18 (Letter from Wilpon to Redding (Jan. 31, 1991)) at 143 ("[i]f all of the participating partners agree to the settlement contained in this letter . . ., I will then apply the settlement contained in this letter to those partners. I would like to file [with the Tax Court] a Motion for Entry of Decision and proposed decision by February 28, 1991."). Mr. Redding's subsequent letter of July 5,

1991, requesting clarification, PX 12 (Letter from Redding to Stoddard and Wilpon (July 5, 1991)) at 81–98, was treated as a counter-offer, *see supra*, at 234, quoting PX 11 (Letter from Stoddard and Wilpon to Redding (Oct. 17, 1991)) at 78; *see also Gingerich II*, 82 Fed.Appx. at 37, thus barring consideration of the terms set out by Mr. Wilpon on January 31, 1991, as constituting a continuing offer. However, those same terms were revived by the letter from Messrs. Stoddard and Wilpon rejecting the counter-offer. *See* PX 11 ("the existing settlement offer will remain open for a reasonable period of time"). Shortly thereafter, any doubt about the viability of those terms as an offer was removed by Mr. Redding's proffer to the IRS's counsel of a draft acceptance form that reflected the language set out originally in the letter of January 31, 1991 by Mr. Wilpon, *see* PX 9 (Facsimile from Redding to Wilpon and Stoddard (Nov. 13, 1992)) at 73–75, and the ensuing confirmation by Mr. Wilpon via his facsimile to Mr. Redding on November 17, 1992, that the IRS "agree[d] with your outline of the settlement terms set out in the Draft Acceptance Form." PX 8 (Facsimile from Wilpon to Redding (Nov. 17, 1992)) at 70–72. The way was thus prepared for each of Mr. Redding's clients to accept the terms by executing the agreed Settlement Form.

In this instance, there also was little doubt that the parties legally were in a position to settle partnership items via a straightforward settlement agreement. On August 5, 1992, the Fifth Circuit had announced its decision in *Treaty Pines*, a case in which Mr. Redding served as taxpayers' counsel, holding that taxpayers "could settle their case with respect to th[o]se partnership items [then before the Tax Court] without a closing agreement, and without regard to whether a closing agreement was contemplated or completed as to affected items and interest." 967 F.2d at 212. Consequently, the applicable legal framework should have been evident to all involved. *See* Tr. 425:4–6 (Test. of Paine) (indicating her awareness of *Treaty Pines* from the time that decision was rendered).

Mr. Redding's clients manifestly sought to be bound by the submission of their completed Redding Acceptance Forms. Tr. 973:2–23 (Test. of Redding); PX 24 (Letter from Redding to Wilpon (Dec. 30, 1992)) at 175–76 ("Enclosed [are] my client[s'] acceptances of the settlement offer."). The language of the taxpayers' Acceptance Forms also recited that "this form constitutes our acceptance of your settlement offer." *See, e.g.*, PX 24A (Acceptance Form for Mr. and Mrs. Gingerich (Dec. 29, 1992)) at 177. Because Mr. Wilpon never specified a different method of acceptance, and indeed, approved the Acceptance Form used by Mr. Redding, the use of the Redding Acceptance Form was objectively reasonable.

Wholly apart from the form of acceptance, it is evident that there was a meeting of the minds as to the terms. Substantively, the terms never changed from offer to acceptance to final memorialization in the closing agreement documents. The "variations in terms," which the Federal Circuit directed this court to consider on remand, *Gingerich II*, 82 Fed.Appx. at 39, amount to mere linguistic differences, not substantive changes to the nature of the agreement. All recitations of the terms limited each partner's distributive share of deductible losses from the partnership to sixty percent of the partner's verified cash investment in the partnership. PX 18 (Letter from Wilpon to Redding (Jan. 31, 1991)) ¶¶ 1, 4, 5 at 142–43; PX 24A (Acceptance Form for Mr. and Mrs. Gingerich (Dec. 29, 1992)) ¶¶ 1, 4, 5 at 178; PX 25 (Closing Agreement for Mr. and Mrs. Gingerich (signed by Mr. Gingerich on July 13, 1993 and by Mrs. Gingerich on July 16, 1993)) ¶¶ 1, 2, 3, 4, 5, 6 at 180–84. Each document provided that the government conceded the applicability of certain additions to tax and the partners conceded the applicability of the enhanced interest rate attendant to tax-motivated transactions under former I.R.C. § 6621(c). PX 18 (Letter from Wilpon to Redding (Jan. 31, 1991)) ¶¶ 2, 3 at 142–43; PX 24A (Acceptance Form for Mr. and Mrs. Gingerich (Dec. 29, 1992)) ¶¶ 2, 3 at 178; PX 25 (Closing Agreement for Mr. and Mrs. Gingerich (signed by Mr. Gingerich on July 13, 1993 and by Mrs. Gingerich on July 16, 1993)) ¶¶ 7, 8 at 180–84. As Mr. Redding explained at trial, Tr. 977:11–25 (Test. of

Redding), the language he included in the acceptance forms pertaining to the reversal of reported gains for subsequent years, PX 24A (Acceptance Form for Mr. and Mrs. Gingerich (Dec. 29, 1992)) ¶ 6, at 178, did not add anything new to the bargain. *See* PX 11 (Letter from Stoddard and Wilpon to Redding (Oct. 17, 1991)) at 79 ("[T]he current settlement offer includes the reversal of any gain reported in the later years of this investment."). For purposes of the federal income tax, "income" is understood to include gains, whether ordinary or capital in character. *See* I.R.C. § 61(a) ("gross income means all income from whatever source derived"). Thus, Mr. Redding's "new" term did not operate to deprive the acceptances of effect. *See Restatement (Second) Contracts* § 59, illus. 3 at 146 ("A makes a written offer to B to sell him Blackacre. By usage the offer is understood as promising a marketable title. B replies, 'I accept your offer if you can convey me a marketable title.' There is a contract."). Finally, even assuming *arguendo* that the language respecting reversal of any gain reported in later years did at least add a clarification, that addition was accepted by Mr. Wilpon upon his approval of the acceptance form.[14]

The court therefore holds that a preponderance of the evidence establishes that the parties had formed an agreement as of December 30, 1992. However, that finding does not end the dispute because the government contests whether the agreement pertained to any partnership item then pending before the Tax Court and also whether there was an implied condition that settlement would be effectuated only upon completion of a closing agreement.

### B. A Partnership Item Pending Before the Tax Court

In its remand order, the Federal Circuit recognized that whether IRS district counsel possessed settlement authority over an issue depends on whether the pertinent issue to be resolved was pending before the Tax Court:

> Settlement of an issue before the Tax Court does not require any particular method or form and can be accomplished by letters of offer and acceptance between the IRS attorneys assigned to the case and the taxpayers. In contrast, settlement of items not before the Tax Court requires the execution of a Form 906 Closing Agreement signed by an appropriate senior IRS employee.

*Gingerich II*, 82 Fed.Appx. at 39 (citations omitted); *see also* Rev. Proc. 87–24, 1987–1 C.B. 720, 1987 WL 350407 (sketching the administrative appeals process for cases before the Tax Court). Because the *General Information Associates* case was a TEFRA proceeding, the Tax Court "ha[d] jurisdiction to determine all partnership items of the partnership for the partnership taxable year to which the notice of final partnership administrative adjustment relates [and] the proper allocation of such items among the partners." I.R.C. § 6226(f); *see also Keener,* 76 Fed.Cl. at 457–60; *McGann v. United States,* 76 Fed.Cl. 745, 752–54 (2007).[15] Thus, as the parties agree, district counsel only had authority to bind the government as to partnership items for tax years before the Tax Court. Pls.' Post–Tr. Br. at 11–13; Def.'s Post–Tr. Br. at 3–5.

The government urges that "[t]he 60%-of-verified-cash deduction set forth in the IRS settlement proposal was clearly not a matter before the Tax Court" and accordingly beyond the district counsel's settlement authority. Def.'s Post–Tr. Br. at 8–9. Plaintiffs, however, vigorously maintain that insofar as

---

14. Notably, the added variant, approved by Mr. Wilpon, pertained to an item that was not before the Tax Court in *General Information Associates* because it concerned later tax years than those at issue in that case.

15. As part of the Taxpayer Relief Act of 1997, Congress expanded a court's jurisdiction in a TEFRA proceeding also to include a determination of "the applicability of any penalty, addition to tax, or additional amount which relates to an

adjustment to a partnership item." Pub.L. No. 105–34, § 1238(b)(1)(B), 111 Stat. 788, 1026 (codified at I.R.C. § 6226(f)). This expanded jurisdiction was applicable to "partnership taxable years ending after the date of the enactment of this Act," § 1238(c), 111 Stat. at 1027, namely, August 5, 1997. Consequently, the provisions of the 1997 Act do not apply to the returns at issue in this case.

"the settlement disallowed all partnership items before the Tax Court except the portion agreed upon in the settlement," the settlement necessarily pertained to a partnership item within the jurisdiction of the Tax Court and the settlement authority of the district counsel. Pls.' Post–Tr. Br. at 12–13. Plaintiffs also point out that the assessments at issue in the present case are attributable to the adjustments resulting from the 60%-of-verified-cash term. *Id.* at 12–13. Thus, it is necessary for this court to determine whether the 60%-of-verified cash term concerned a partnership item within the Tax Court's jurisdiction and also the settlement authority of the district counsel.[16]

In the context of TEFRA,

[t]he term "partnership item" means, with respect to a partnership, any item required to be taken into account for the partnership's taxable year under any provision of subtitle A [*i.e.,* the portion of the Internal Revenue Code pertaining to income taxes generally] to the extent regulations prescribed by the Secretary provide that, for purposes of this subtitle [*i.e.,* subtitle F, the portion of the tax code pertaining to procedure and administration], such item is more appropriately determined at the partnership level than at the partner level.

I.R.C. § 6231(a)(3). By regulation, partnership items are "items which are required to be taken into account for the taxable year of a partnership under subtitle A of the Code [and] are more appropriately determined at the partnership level than at the partner level and, therefore, are partnership items." Treas. Reg. § 301.6231(a)(3)–1(a). This regulation also provides that "[t]he term 'partnership item' includes ... legal and factual determinations that underlie the determination of the amount, timing, and characterization of items of income, credit, gain, loss, deduction, etc." Treas. Reg. § 301.6231(a)(3)–1(b).

The pertinent settlement term provided, "For the first open year of each partners' investment the investor will be allowed, to the extent of losses claimed that year, sixty (60) percent of his or her verified out of pocket investment in the partnership less the amount of any partnership losses previously allowed." PX 18 (Letter from Wilpon to Redding (Jan. 31, 1991)) ¶ 1 at 142; *accord* PX 24A (Acceptance Form for Mr. and Mrs. Gingerich (Dec. 29, 1992)) ¶ 1 at 178. Partnership items include "each partner's share of ... [i]tems of income, gain, loss, deduction, or credit of the partnership." Treas. Reg. § 301.6231(a)(3)–1(a)(*l*)(i). Whether the settlement is viewed, as plaintiffs urge, to disallow a partner's distributive share of partnership losses to the extent that share exceeds an amount equal to sixty percent of cash contributions made by the partner to the partnership, Pls.' Post–Tr. Resp. at 26, or, as the government contends, to disallow the entirety of a partner's distributive share of partnership losses but instead permit a partner-level deduction in the amount of sixty percent of the cash the partner contributed to the partnership, Def.'s Post–Tr. Br. at 8, the disallowance still pertains to a "partner's share of ... [i]tems of income, gain, loss, deduction, or credit of the partnership." Treas. Reg. § 301.6231(a)(3)–1(a)(*l*)(i). The disallowance and allowance reflected in paragraph 1 of the settlement constituted, therefore, a partnership item that was before the Tax Court and that district counsel had authority to settle. Moreover, the assessments of additional tax in dispute were attributable to the disallowance of partnership losses.

## C. An Allegedly Implied Condition on Settlement

■ The government makes a set of subsidiary arguments that settlement of the 60%-of-verified-cash partnership item was impliedly conditioned on coordinate settlement of the non-partnership items specified in Mr. Wilpon's letter of January 31, 1991. As the government would have it, a closing agreement was required to make the settlement effective even for the partnership item under the theory that the presence of any term pertaining to a non-partnership item

---

16. Plaintiffs concede that the other terms of the agreement pertained either to non-partnership items or to later tax years. Those terms therefore were outside the jurisdiction of the Tax Court and beyond the settlement authority of the district counsel. *See* Pls.' Post–Tr. Br. at 3–4, 11–12, nn. 7–11.

would cause the agreement to be outside the district counsel's power to enter. Def.'s Post–Tr. Reply at 3. The government would have this court find that any settlement as to the partnership item was conditioned on the settlement of non-partnership items. *See id.* at 4 (Because "the IRS settlement proposal could not be accepted in its entirety by any means other than a closing agreement, ... there was no settlement until the closing agreements were executed on September 22, 1993.").

Undoubtedly, the settlement agreement *could* have been conditioned on coordinate settlement of both partnership and non-partnership items. Here, however, the government's argument fails because no such condition was expressed. *See Treaty Pines,* 967 F.2d at 212 ("[Taxpayers] could settle their case with respect to ... partnership items [then before the Tax Court] without a closing agreement, and without regard to whether a closing agreement was contemplated or completed as to affected items and interest."); *cf. Klein v. Commissioner,* 899 F.2d 1149, 1153 (11th Cir.1990) ("At most, the letter dated March 7, 1986 from the District Counsel was a conditional offer of settlement which would become binding upon the execution of another document, a closing agreement. This letter specifically mentioned other conditions which must be met before a settlement could be reached; namely, the taxpayer must substantiate his investment, provide copies of all returns reflecting any interest in the tax shelters, and execute a closing agreement."). A court "cannot rewrite a contract or insert words to which a party has never agreed." *American Capital Corp. v. Federal Deposit Ins. Corp.,* 472 F.3d 859, 865 (Fed.Cir.2006); *see also Patton v. United States,* 7 Ct.Cl. 362, 1800 WL 1401, at *8 (1871) ("Manifestly, no such condition is there expressed. Will the law suppose that the parties had it in mind at the time, though not expressed? We see no room for so violent a supposition, but the contrary."). Mr. Redding, on behalf of his clients, had agreed to settle the partnership item even though he recognized that a binding settlement pertaining to the non-partnership items could not be entered except by a closing agreement. PX 9 (Facsimile from Redding to Wilpon and Stoddard (Nov. 13,

1992)) at 73; *see Spartan Aircraft Co. v. United States,* 120 Ct.Cl. 327, 100 F.Supp. 171, 173–74 (1951) ("The severability, or divisibility, of a contract is a vexing problem.... [T]he question is essentially one of the intention of the parties."). Had the IRS wanted to condition the taxpayers' power of acceptance to require that a closing agreement effectuate settlement of partnership as well as non-partnership items, all it had to do was to communicate that fact to Mr. Redding. *See Restatement (Second) Contracts* §§ 36, 42, 60 at 102, 113, 147. Neither the letter of October 22, 1992, nor the facsimile of November 17, 1992, did so. *See* PX 10 (Letter from Stoddard and Wilpon to Redding (Oct. 22, 1992)) at 76–77; PX 8 (Facsimile from Wilpon to Redding (Nov. 17, 1992)) at 70–72. Accordingly, it was objectively reasonable for Mr. Redding and his clients to believe that the IRS sought to be bound by its offer upon acceptance by the taxpayers.

By contrast, both Ms. Paine and Mr. Mac-Lean negotiated to consummate the settlement of both partnership and non-partnership items through a closing agreement. DX 1 (Letter from Paine to Wilpon and Stoddard (Nov. 12, 1992)) at 272 ("on the condition that an appropriate Closing Agreement can be entered"); PX 4 (Letter from Wilpon to Mac-Lean (Dec. 18, 1992)) at 61 (responding to a letter from MacLean and noting that the IRS could not process a closing agreement until a tax matters partner had been chosen). Ms. Paine explained that she "had a little different concern and balanced the issues a little differently" than Mr. Redding did. Tr. 429:24 to 430:1 (Test. of Paine). Unlike Ms. Paine and Mr. MacLean, Mr. Redding evidently was willing to accept certainty regarding the resolution of the partnership item even if it meant ceding bargaining leverage regarding the ultimate resolution of non-partnership items. *See* Tr. 1024:8–12 (Test. of Redding) (Mr. Redding understood that settlement of non-partnership items "would not have been enforceable without appeals authorization or ... [being able] to prove ... an estoppel argument."); *see also United States v. Bethlehem Steel Corp.,* 315 U.S. 289, 298, 62 S.Ct. 581, 86 L.Ed. 855 (1942) ("Whether a number of promises constitute

one contract or more than one is to be determined by inquiring 'whether the parties assented to all the promises as a single whole, so that there would have been no bargain whatever, if any promise or set of promises were struck out.'" (quoting *Williston on Contracts*, Rev. Ed., § 863)).

In the Fifth Circuit's *Treaty Pines* decision, that court rejected requiring that the settlement of partnership items be conditioned on the settlement of non-partnership items absent the parties actually making such a condition attendant to their agreement. Because this legal context was firmly established by the time final negotiations were occurring here, it was incumbent upon the government to communicate its desire for such a requirement if the government wished to depart from settled norms. *See Treaty Pines*, 967 F.2d at 211 ("[T]here is nothing in the record before us to indicate that signature of a Form 906 was a requirement of acceptance, nor anything to indicate that the [taxpayers] were made aware of this supposed requirement."). Counsel knew that entering a settlement of non-partnership items was outside the district counsel's authority. Correlatively, the parties understood that settlement of the partnership item was not necessarily bound up with and contingent upon the settlement of non-partnership items.

The government urges the court to look to Mr. Wilpon's post-event correspondence of early 1993, which included the reservation language that "no settlement occurs until closing agreements are signed by your clients and countersigned by the appropriate Service representative," PX 5 (Letter from Wilpon to Redding (Feb. 18, 1993)) at 66; *accord* PX 6 (Letter from Wilpon to Redding (Jan. 26, 1993)) at 67, as evidence that the parties intended to use a closing agreement to effectuate settlement of both partnership and non-partnership items together. Def.'s Pre–Tr. Br. at 5. In this regard, the government's contention is unpersuasive because those communications were made subsequent to the return of the Acceptance Forms by Mr. Redding's clients. "A court, of course, must be extremely careful in referring to actions of parties after a contract is executed

as an aid to interpreting intention, particularly actions of one party not concurred in by the other." *Jennings v. General Med. Corp.*, 604 F.2d 1300, 1306 (10th Cir.1979). Far from concurring with Mr. Wilpon's expressed view, Mr. Redding went "ballistic," Tr. 1025:4 (Test. of Redding), and fired off an accusation that the IRS was "attempt[ing] to repudiate the settlement." PX 3 (Letter from Redding to Wilpon (Mar. 17, 1993)) at 57–58. If anything, Mr. Wilpon's attempts to introduce a post-hoc reservation suggest that he believed an agreement had been formed. *Cf. Power Serv., Inc. v. MCI Constructors, Inc.*, 36 Fed.Appx. 123, 126 (4th Cir.2002) ("The fact that Sciaroni and Power Services awoke the next morning with a case of buyers' remorse does not change the fact that they had previously made an offer to settle which MCI had accepted."). Likewise, Mr. Wilpon's prescient admonition to IRS officials that "any assessments ... be made [before No]vember 1, 1993" in anticipation of "a *Treaty Pines Investments* type argument," PX 156 (Form 1734, Transmittal Memorandum, Wilpon to Pinero (undated)) at 2689, is indicative that he believed the essential elements of contract formation had been met by the submission of the Acceptance Forms.

### CONCLUSION

In sum, the parties did not require a closing agreement to effectuate settlement of the partnership item before the Tax Court. The parties having no intentions to the contrary, the Acceptance Forms approved in advance by the IRS's counsel and then signed and submitted by plaintiffs before the extended deadline imposed by IRS's counsel, were a valid acceptance of the government's offer to resolve the partnership item, binding both the government and the taxpayers to the specified tax treatment. At that time, the partnership item was transformed into a non-partnership item. The IRS thereafter failed to assess applicable taxes within the statutorily prescribed one-year period. *See* I.R.C. §§ 6229(f), 6231(b)(1). Thus, the assessments were time barred, and plaintiffs are entitled to a refund.

The parties shall confer in an effort to resolve the specific amounts of the refunds

due and shall submit a reckoning of the amounts on or before July 25, 2007, by agreement if possible, or separately, if agreement is not possible. By that same date, pursuant to RCFC 25, plaintiffs shall submit a motion for substitution of parties for the six deceased plaintiffs. This motion should identify, for each deceased plaintiff, the appropriate executors or representatives of the decedent's estate to be substituted as the decedent's successor-in-interest to the present claim. Defendant shall file a response to this motion by August 2, 2007. Final judgment will thereafter be entered.

IT IS SO ORDERED.